FILED

2022 Mar-23  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| JESSE L. THORNTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   4:20-cv-01614-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Jesse Thornton seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability, disability insurance, and supplemental security income benefits.   The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.   The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 12).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's

2

impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925.   That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.   *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.   20 C.F.R. §§ 404.1520(e), 416.920(e).   At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.   *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).   If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.   *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.   20

3

C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).   If the claimant can perform other work, the evaluator will not find the claimant disabled.   *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.* (citations omitted).   Nonetheless, substantial evidence exists even if the evidence preponderates

against the Commissioner's decision.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Thornton, age 49 at the time of the ALJ hearing, protectively filed applications for a period of disability, disability insurance, and supplemental security income benefits on June 19, 2018, alleging disability as of June 6, 2018.   (Tr. 181, 301-10).   The Commissioner denied Thornton's claims, and Thornton timely filed a request for an administrative hearing.   (Tr. 229-42, 245-58).   The Administrative Law Judge ("ALJ") held a hearing on January 7, 2020 (Tr. 176-94), and issued an opinion on January 29, 2020, denying Thornton's claim.   (Tr. 158-71).

Applying the five-step sequential process, the ALJ found at step one that Thornton did not engage in substantial gainful activity after June 6, 2018, his alleged onset date.   (Tr. 164).   At step two, the ALJ found Thornton had the severe impairments of arrhythmia, status post pacemaker implantation with cellulitis, degenerative disc disease, testicular pain, chronic obstructive pulmonary disorder, sleep apnea, chronic kidney disease, depression, and anxiety.   (*Id.*).   At step three, the ALJ found that Thornton's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.*).

Next, the ALJ found that Thornton exhibited the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing of ladders, scaffolds, occasional climbing of ramps and stairs, occasional balancing, kneeling, crouching, stooping, no crawling, occasional exposure to extreme heat and cold, occasional exposure to vibration, occasional exposure to moderate levels of fumes, odors, chemicals, gases, dust, should avoid all hazardous machinery and unprotected heights.  Also during a regularly scheduled workday or the equivalent thereof, the individual can understand and remember short and simple instructions but is unable to do so with complex instructions; can do simple, routine, and repetitive tasks but is unable to do so with detailed or complex tasks; can have no more than occasional contact with the general public; and can deal with changes in the workplace if introduced occasionally, gradually, and are well explained.

 (Tr. 166).

At step four, the ALJ determined Thornton could not perform his past relevant work as a grinder, assistant restaurant manager, or kitchen manager.  (Tr. 169-70). However, at step five, the ALJ determined Thornton could perform a significant number of other jobs in the national economy considering his age, education, work experience, and RFC.  (Tr. 170).  Accordingly, the ALJ determined that Thornton has not suffered a disability, as defined by the Social Security Act, since June 6, 2018.  (Tr. 171).

Thornton timely requested review of the ALJ's decision.  (Tr. 296-98). Thornton submitted additional evidence to the Appeals Council, but on September 25, 2020, the Appeals Council denied review, which deems the ALJ's decision as the

Commissioner's final decision.   (Tr. 1-7).   On October 14, 2020, Thornton filed his complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Thornton argues the ALJ improperly considered the opinion of consultative psychologist June Nichols and reached a residual functional capacity finding that lacks substantial evidentiary support.   He also asserts the Appeals Council improperly failed to consider post-decision evidence, and the new evidence the Appeals Council received deprived the ALJ's decision of substantial evidentiary support.   For the reasons discussed below, the undersigned concludes none of those contentions warrants reversal.

## I.   The ALJ Properly Considered the Consultative Psychological Examiner's Opinion

Thornton first asserts the ALJ improperly considered the opinion of consultative psychological examiner June Nichols, Psy.D.   For the reasons discussed, the court disagrees and finds that the ALJ properly considered Dr. Nichols' opinion.

On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404.1520c, 416.920c).   Thornton's claims, filed on June 19, 2018, fall under the revised regulations.

Pursuant to the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion. *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations. 20 C.F.R. §§ 404.1520c(c)(3)(i)-(iv), 416.920c(c)(3)(i)-(iv). The ALJ "may" conclude that an

8

examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.   20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v).   The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."   20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).

June Nichols, Psy.D., performed a consultative examination on November 14, 2018, at the request of the Commissioner.   During the mental status examination, Thornton presented as neat and clean, and he maintained good eye contact.   He displayed normal, clear speech, depressed mood, and normal affect.   He reported trouble falling asleep at night and waking frequently because he feels like he cannot breathe.   He reported good appetite, decreased energy, ease of fatigue, and crying episodes.   He denied suicidal or homicidal ideation.   He displayed clear stream of consciousness, full orientation, fair mental processing, grossly intact recent and remote memory, adequate fund of information, adequate abstract thinking, normal thought processes and content, fair judgment and insight, and borderline intelligence.   He reported experiencing panic attacks when he feels very upset or angry.   (Tr. 649-51).

Dr. Nichols described Thornton's reported daily activities as follows:

9

> Mr. Thornton lives with his mother and she handles everything. He gets up in the morning and talks to his mother, tries not to do very much because he cannot walk without causing pain in his feet. He takes his medicines and prays, then lays back down. He said that he tries to keep his room clean and to wash his own clothes. His mother takes care of everything else in the house. Before he began to have problems he had a job, a car, his own home and took care of himself. His sleep schedule varies, but his current medication is helping him to sleep better. He eats two or three meals each day. He is not involved in any activities or organizations in the community. He does not attend church. He has a few good friends.

(Tr. 651).

Dr. Nichols assessed Thornton as experiencing panic disorder, moderate depressive disorder due to his medical conditions, and borderline intelligence. She characterized his prognosis for significant improvement over the ensuing 12 months as poor, though Thornton cooperated throughout the examination. (Tr. 651-52). In conclusion, Dr. Nichols stated:

> The medical evidence of record provided by DDS was reviewed and those findings were considered in the overall assessment of the patient. [Thornton] appeared able to understand, carry out, and remember instructions. He is unable to sustain concentration and persist in a work relate[d] activity at a reasonable pace due to the chronic pain in his feet and knee, as well as the hernia. He is likely unable at this time to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public. He is likely unable to deal with normal pressures in a competitive work setting. He is likely able to manage his own funds. As the medical issues are addressed, Mr. Thornton reported that he has always worked and he wants to be able to return to work.

(Tr. 652).

The ALJ did not find Dr. Nichols' opinions persuasive, as Dr. Nichols' "conclusions regarding [Thornton's] inability to concentrate and to interact are inconsistent with her own reports, [Thornton's] recent work history, lack of treatment for these alleged problems, and with the record as a whole."   (Tr. 169).

The ALJ properly applied the revised regulations by assessing the consistency of Dr. Nichols' opinions with the remainder of the evidence, and by considering whether Dr. Nichols' notes supported her opinions.   *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).   Thornton's argument that the ALJ failed to state with "some measure of clarity" his reasons for rejecting Dr. Nichols' opinion follows case law under the previous regulations, which required affording deference to treating physicians, and to examining physicians under certain circumstances.   In any event, as set forth above, the ALJ did clearly state his reasons for rejecting Dr. Nichols' opinion.

Thornton argues the court should apply a higher standard to review the ALJ's decision to reject the opinion of a consulting medical professional the Social Security Administration hired, basing his contention upon a Seventh Circuit case, *Wilder v. Chater*, 64 F.3d 355 (7th Cir. 1995), that the Eleventh Circuit has repeatedly declined to follow.   *See, e.g., Hand v. Social Security Administration,* 786 F. App'x 220, 226 (11th Cir. 2020); *Jackson v. Social Security Administration, Comm'r,* 779 F. App'x. 681, 685 (11th Cir. 2019); *Arnold v. Social Security Administration,* 724 F. App'x. 772, 779 n.3 (11th Cir. 2018).

11

In addition, substantial evidence supported the ALJ's decision.  The only negative findings during Dr. Nichols' examination included depressed mood, decreased energy, sleep disturbances, and panic attacks.  Otherwise, Thornton displayed good eye contact, normal speech, appropriate affect, good appetite, no suicidal or homicidal ideation, clear stream of consciousness, full orientation, fair mental processing speed, grossly intact recent and remote memory, adequate fund of information, abstract thinking, normal thought processes, normal thought content, fair judgment and insight, and borderline intelligence.  The ALJ reasonably found those clinical findings did not support Dr. Nichols' conclusion that Thornton could not concentrate or interact with others.

The ALJ also reasonably found Thornton's work history was not consistent with the limitations Dr. Nichols imposed.  Thornton continued to work after he began experiencing depression and anxiety.  He even continued working for approximately three years after he and a coworker engaged in an altercation, which caused him a panic attack necessitating an emergency room visit.  (Tr. 517).

The record also supports the ALJ's conclusion that Thornton did not seek mental health treatment for any of his conditions.  The treatment notes in the record reflect no more than mild to moderate symptoms.  On October 20 and 22, 2017, Thornton presented at the emergency room as calm, cooperative, fully oriented, and with normal affect.  (Tr. 488, 495).  On September 12, 2018, February 12, 2019,

February 12, 2019, and April 15, 2019, he presented as alert, oriented, and cooperative, with appropriate mood and affect and normal judgment.   (Tr. 637, 774, 803, 813).   On September 10, 2018, September 13, 2018, and October 7, 2018, he presented as alert and oriented.   (Tr. 620, 631, 646).   On February 15 and September 20, 2018, he informed providers at First Care Medical Clinic that he did not experience anxiety, depression, eating disorder, hallucinations, insomnia, memory loss, suicidal thoughts, or mania, and he appeared fully alert and oriented, with appropriate mood and affect. (Tr. 731-32, 735-36).

As the ALJ followed applicable law when considering Dr. Nichols' opinion, and substantial evidence supported the ALJ's findings, the ALJ did not err.

## II.   The ALJ Properly Assessed Thornton's Residual Functional Capacity to Perform Light Work

As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing his or her "ability to meet the physical, mental, sensory, and other requirements of work."   20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4).   The claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).   Assessing a claimant's RFC lies within the exclusive province of the ALJ.   *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); 20 C.F.R. §§ 404.1546(c), 416.946(c) ("[T]he administrative law

judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017 WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

The ALJ determined Thornton retained the RFC to perform a limited range of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R.  §§ 404.1567(b), 416.967(b).  Thornton argues that the ALJ should have found him capable of performing only sedentary work, which would qualify him as disabled pursuant to Grid Rule 201.12 of the Medical-Vocational Guidelines.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

Thornton asserts he "has severe impairments," and "[w]hile the ALJ summarized the medical evidence, the RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence, as required by SSR 96-8p." (Doc. 14, at 23-24).   He also asserts the ALJ "omitted any limitations caused by severe pain."   (*Id.* at 24).

Social Security Ruling 96-8p dictates that an RFC assessment must first determine the claimant's functional limitations and then address the claimant's ability to work on a function-by-function basis, pursuant to the functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945.   SSR 96-8p, 1996 WL 374184, *1.   The ALJ does not need to enumerate every piece of evidence or function used in his determination, but rather must simply portray that he considered the claimant's medical conditions in totality.   *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009). Once the ALJ has conducted that determination, the ALJ may then express the RFC in terms of exertional levels such as sedentary, light, medium, heavy, and very heavy.   SSR 96-8p, 1996 WL 374184, at *1; *see Castel*, 355 F. App'x at 263; *Freeman v. Barnhart*, 220 F. App'x 957, 959-60 (11th Cir. 2007); *see also Bailey v. Astrue*, No. 5:11-CV-3583-LSC, 2013 WL 531075, *6 (N.D. Ala. Feb.11, 2013).

The ALJ's analysis in this case satisfied the requirements of SSR 96-8p, and substantial evidence supports his RFC formulation.   Thornton did not accurately describe the ALJ's RFC finding as conclusory, devoid of rationale and supporting evidence, and omitting any limitations resulting from pain.   To the contrary, the ALJ thoroughly described Thornton's medical records and thoroughly explained how Thornton's physical and mental conditions affected his ability to work.   He noted that while Thornton had a pacemaker and suffered from sleep apnea, musculoskeletal pain, and cervical disc disease, his chiropractor limited him to light work, and his symptoms had not worsened since that limitation.   The ALJ also considered that Thornton moved furniture a few months after the chiropractor's assessment, he retained full range of motion despite complaining of ankle swelling, and his testicular imaging remained unchanged.   (Tr. 168).

Moreover, the ALJ accounted for Thornton's fatigue, back pain, and neck pain by limiting him to no climbing ladders, ropes, and scaffolds, and avoiding hazardous machinery and unprotected heights.   To accommodate Thornton's knee pain and heart impairment, the ALJ found Thornton should not crawl; should only occasionally climb ramps and stairs, balance, kneel, crouch, and stoop; should only occasionally endure exposure to moderate levels of fumes, odors, chemicals, gases, and dusts; and should avoid extreme heat, cold, and more than occasional vibration.   To accommodate Thornton's mental symptoms and reduce his stress level, the ALJ limited him to only

16

occasional contact with the general public and only gradual, occasional, and well-explained workplace changes.  (Tr. 168-69).

Thornton asserts the ALJ found he only had minor physical limitations, but that assertion does not accurately portray the ALJ's decision, as the ALJ found Thornton suffered multiple severe impairments, and he assessed significant functional limitations.

Finally, Thornton asserts the ALJ's RFC finding lacks substantial support because the ALJ did not rely upon a formal functional assessment by a treating or examining physician.  However, relevant authority clearly establishes that the responsibility for conducting an RFC analysis rests with the ALJ, not with any medical provider.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (stating that RFC and disability determinations constitute "issues reserved to the Commissioner"); *Beegle v. Soc. Sec. Admin., Com'r*, 482 F. App'x 483, 486 (11th Cir. 2012) (citing 20 C.F.R. §§ 404.1527(d) ("A claimant's residual functional capacity is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

In summary, the court finds the ALJ properly assessed Thornton's residual functional capacity to perform light work, and substantial evidence supports the ALJ's decision.  The ALJ did not err.

III.   **The Appeals Council Properly Considered the New Evidence Thornton Submitted**

Generally, a claimant may present new evidence at each stage of the administrative process.  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. §404.900(b)).   The Appeals Council will review a case if it receives additional "evidence that is new, material, and relates to the period on or before the date of the [ALJ] hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."   20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5).

Here, Thornton submitted additional medical records to the Appeals Council after the ALJ's decision.   The Appeals Council stated it applied the following standard when it considered the new evidence:

> We receive additional evidence that you show is new, material, and relates to the period on or before the date of the hearing decision.   You must also show there is a reasonable probability that the additional evidence would change the outcome of the decision.   You must show good cause for why you missed informing us about or submitting it earlier.

(Tr. 1-2).

The Appeals Council received medical records from Quality of Life Health Services, dated March 25, 2019, through January 22, 2020, but it found the evidence "does not show a reasonable probability that it would change the outcome of the

18

decision." Consequently, it did not exhibit the evidence. (Tr. 2). The Appeals Council also received

> records from Quality of Life Health Services, covering the period March 17, 2020 through April 2, 2020 . . ., a psychological evaluation report from June Nichols, Psy.D, dated May 14, 2020 . . ., a mental health source statement completed by Dr. June Nichols, dated May 28, 2020 . . ., and a physical capacity form completed by Dr. Pascual Herrera, dated August 3, 2020 . . . .

(*Id.*). However, it concluded that evidence did "not affect the decision about whether you were disabled beginning on or before January 29, 2020," as the ALJ decided the cause through January 29, 2020, and the additional evidence did "not relate to the period at issue." (*Id.*). The Appeals Council advised Thornton he could file a new claim if he wanted the Social Security Administration to consider his disability status after January 29, 2020. (*Id.*).

Thornton argues the Appeals Council applied the incorrect legal standard when it assessed whether a reasonable *probability* existed that the new evidence would change the outcome of the administrative decision, as it should have assessed whether a reasonable *possibility* existed of changing the outcome. (Doc. 14, at 27; Doc. 16, at 11). That argument lacks merit. Effective January 17, 2017, the Commissioner revised 20 C.F.R. §§ 404.970(a)(5) & 416.1470(a)(5) to include the above-stated requirement that new evidence must demonstrate a "reasonable probability" of changing the outcome of the ALJ's decision, with compliance required as of May 1, 2017. *See* 81 FR 90987-01,

2016 WL 7242991 (Dec. 16, 2016).   Thus, the Appeals Council correctly applied the language of the regulation in effect on the date of Thornton's appeal.

Thornton does not contest the Appeals Council's conclusion that the March 25, 2019 – January 22, 2020, Quality of Life Health Services records failed to show a reasonable probability of changing the outcome of the administrative decision.   Rather, he argues the Appeals Council erroneously concluded the other pieces of new evidence did not relate to the time period in question.

As the Eleventh Circuit recently reiterated, "'[m]edical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant.'"   *Howze v. Soc. Sec. Admin.*, No. 21-11066, 2022 WL 152236, at *2 (11th Cir. Jan. 18, 2022) (quoting *Washington v. Social Security Administration, Commissioner*, 806 F.3d 1317, 1322 (11th Cir. 2015)).   The Eleventh Circuit explained its method for evaluating the chronological relevance of such opinions:

> In *Washington*, the claimant submitted to the Appeals Council a psychologist's evaluation and accompanying opinion about the degree of the claimant's mental limitations, which were prepared seven months after the ALJ's decision. *Id.* at 1319.   We concluded that the psychologist's materials were chronologically relevant because: (1) the claimant described his mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision. *Id.* at 1322-23 (limiting its holding to "the specific circumstances of this case").
>
> But we have also held that the Appeals Council correctly declined to consider new medical records because the records were "about a later

time" than the ALJ's decision, and, therefore, did not affect the decision about whether the claimant was disabled during the relevant period. *Hargress*[ *v. Soc. Sec. Admin., Comm'r*], 883 F.3d [1302,] 1309[ (11th Cir. 2018)]. In *Hargress*, we held that the new records were not chronologically relevant because nothing in them indicated that the doctor, who did not treat the claimant during the relevant period, had reviewed the appellant's medical records, or that the information in the new records related to the period at issue. *Id.* at 1309-10.

*Howze,* 2022 WL 152236, at *2.[2]

> **A.   The Appeals Council Properly Found the March 17, 2020, through April 2, 2020, Records from Quality of Life Health Services Did Not Chronologically Relate to the Time Period of the ALJ's Decision, But Even if They Did, They Did Not Provide Material Evidence That Probably Would Change the Administrative Decision**

On March 17, 2020, Thornton received treatment from Quality of Life Health Services for chronic testicular pain and medication management.  He reported joint pain and swelling, but his pain on that occasion manifested at level zero of ten.  The clinical examination revealed Thornton walked with a cane, and he displayed full orientation and appropriate mood and affect.  The nurse practitioner encouraged him to exercise and adjust his diet, and she referred Thornton to a urologist.  (Tr. 135-41).

On March 19, 2020, Thornton presented to Quality of Life with moderate,

---

[2] On November 16, 2021, Thornton filed a notice of Supplemental Authority alerting the court to the Eleventh Circuit's decision in *Pupo v. Comm'r, Soc. Sec. Admin.*, 17 F.4th 1054 (11th Cir. 2021). However, the *Pupo* decision merely reiterates the general principle that the Appeals Council errs when it fails to consider new, material, and chronological evidence.  *Id.* at 1063.  Moreover, in *Pupo,* the claimant submitted to the Appeals Council evidence that she underwent surgery for a pre-existing condition nine days *before* the ALJ's decision.  *Id.*  Those facts do not assist the court in evaluating this case, in which Thornton submitted to the Appeals Council evidence that post-dated the ALJ's decision by several months.

intermittent elbow and knee pain, and intermittent testicular pain.   Dr. Herrera noted he had experienced panic attacks in the past, and Thornton reported abnormal sleep, anxiety, depression, difficulty concentrating, and fearfulness.   Physically, he reported back pain, joint instability and tenderness, muscle weakness, myalgia, neck stiffness, and rheumatologic manifestations.   However, the clinical examination revealed full orientation, appropriate mood and affect, normal insight, and normal judgment. Thornton manifested a limp and tenderness in his elbow and knee, and moderate pain with motion in those joints.   He also displayed normal range of motion in the cervical and thoracic spine.   Dr. Herrera stated Thornton needed a cane and a knee splint, and he adjusted Thornton's medications.   (Tr. 142-49).

On April 2, 2020, during a telemedicine visit, Thornton reported no active problems other than his moderate chronic testicular pain, sleep problems, arthritis, blood pressure problems, and pain.   Dr. Herrera adjusted Thornton's medications. (Tr. 150-57).

Chronologically, these records describe Thornton's ongoing medical problems, but they describe the status of those problems as of late March and early April 2020, not the status of those problems at the time of the ALJ's January 29, 2020, decision.

Moreover, even if these Quality of Life records chronologically related to the time period of the ALJ's decision, they do not provide material evidence that probably would change the administrative decision as they reflected normal psychological

22

findings and no more than moderate physical symptoms.   Accordingly, the Appeals

Council did not err in considering these records.

**B.    The Appeals Council Properly Found Dr. Nichols' May 14, 2020, Psychological Evaluation Report and May 28, 2020, Mental Health Source Statement Did Not Chronologically Relate to the Time Period of the ALJ's Decision**

On May 14, 2020, Dr. Nichols re-evaluated Thornton at his attorney's request.

She reviewed medical records from North Alabama Cardiology Clinic from September

24, 2014, through September 13, 2015; records from Gadsden Regional Medical Center

from November 10, 2010, through December 26, 2019; records from First Care

Medical Clinic from July 8, 2013, through October 7, 2018; records from Riverview

Medical Center from January 23, 2014; records from Wood Chiropractic Clinic from

October 27, 2017, to July 2, 2018; January 2, 2018, records from Advance Imaging ; and

her own November 14, 2018, report.   Other than Dr. Nichols' previous report, those

records primarily reflect Thornton's physical problems, but he also reported depression

on January 21, 2014, and September 24, 2014; anxiety on July 8, 2013, October 15, 2013,

January 21, 2014, April 17, 2015, October 2, 2015, April 15, 2019, and April 17, 2019;

and a panic attack on May 6, 2014.   (Tr. 10-12).

During the consultation with Dr. Nichols, Thornton reported increased

irritability as a result of his physical problems.   He also reported suffering from sleep

apnea, which increased his anxiety level and caused panic attacks.   During the mental

23

status examination, Thornton presented as neat and clean, with fair eye contact; clear, normal speech; normal mood congruent with thought processes; and appropriate affect. He reported trouble sleeping, varied appetite, lack of energy, and crying episodes, but he denied suicidal or homicidal ideation.   He demonstrated clear stream of consciousness, full orientation, normal thought processes, normal conversational pace, no auditory or visual hallucinations, no delusions, and no ideas of reference.   He does not like being in crowds of more than five people, but he did not respond to any internal stimuli, and he denied obsessions and compulsions.   He reported panic attacks requiring emergency room visits, but he demonstrated good judgment and insight.   He demonstrated fair mental processing speed, intact remote memory, fair immediate memory, fair general fund of knowledge, and concrete thinking.   Dr. Nichols estimated he possessed borderline intelligence.   (Tr. 13-14).

Thornton reported living with his mother but "getting on [her] nerves," sometimes visiting his sister or a friend, and having a few good friends, but he did not participate in church or other activities.   (Tr. 15).   During the prior six months, Thornton experienced

> depressed mood, diminished interests or pleasure, sleep disturbance, fatigue, hopelessness, weight change, excessive worry, feel like losing control, irritability, tension, feelings of panic, socially withdrawn, use of alcohol, use of tobacco, anxiety in social settings, makes careless mistakes, does not complete tasks, difficulty organizing, forgetful, confusion, disorientation, compulsive checking, indecisiveness, emotionally distant from others, racing thoughts, little interest in sexual activity, sexual

problems, impulsive, think about hurting myself, think about hurting someone else, recent distressing dreams.  His symptoms of depression and anxiety are severe.

(*Id.*).

Dr. Nichols summarized Thornton's physical problems, and she stated he had never undergone psychological counseling.  Rather, his primary care physician had prescribed medication over the past three years to treat his anxiety and depression.  His anxiety escalated after he began experiencing heart and sleep problems.  As a result of his inability to work, he battles depression and hopelessness, thinks less of himself, does not see a way to become independent, and feels like he annoys his mother.

Dr. Nichols assessed Thornton with major depressive disorder, recurrent, severe; panic disorder; and borderline intelligence.  (Tr. 15-16).  She stated:

> Mr. Thornton can understand, remember and carry out very short and simple instructions, but he would have difficulty with complicated or lengthy instructions.  He cannot maintain attention, concentration and/or pace for periods of at least two hours.  He cannot perform activities within a schedule and be punctual within customary tolerances. He can sustain an ordinary routine without special supervision.  He can adjust to routine and infrequent work changes.  He can interact with supervisors and or coworkers.  He can maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  He would likely be off task 30 to 35% of the time in an 8-hour day because of the fact that his legs swell and he has to sit down and prop them up because they become very painful and he can think of nothing else.  He would likely miss 8-10 days out of a 30 day work week [*sic*] period because of his psychological issues.  His limitations existed back to 6/6/18 and beyond.  His medications could make him need to go to the bathroom frequently and make him feel tired.

25

(Tr. 16).

On May 28, 2020, Dr. Nichols completed a Mental Health Source Statement form.   She indicated Thornton could understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; interact with supervisors and/or coworkers; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness.   However, he could not maintain attention, concentration, and/or pace for at least two hours, and he could not perform activities within a schedule and be punctual within customary tolerances.   He would be off-task 30-35% of an eight-hour day, and he would miss eight to ten days of work during a thirty-day period.   His limitations existed back to June 6, 2018.   (Tr. 9).

Though Dr. Nichols assessed Thorntons' symptoms dating back to his disability onset date and reviewed treatment records from the time period before the ALJ's decision, some of which described mental health symptoms, the evidence indicates Thornton's mental health condition declined between the date of Dr. Nichols' first evaluation and the date of her second evaluation and Mental Health Source Statement assessment.   In her first report, Dr. Nichols stated Thornton suffered from moderate depressive disorder, but in the second report, she stated he suffered from severe depressive disorder.   (Tr. 16, 651).   As the second report, submitted after the ALJ's decision, reflected a decline in Thornton's mental health condition, the Appeals Council

26

properly concluded that report did not relate to Thornton's disability status on or before January 29, 2020, the date of the ALJ's decision.   *See McClain v. Soc. Sec. Admin.*, 760 F. App'x 728, 732-33 (11th Cir. 2019) (psychologist's report did not relate back to the time period of the ALJ's decision when it reflected the claimant's cognitive skills declined in the interim); *Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966, 969 (11th Cir. 2018) (doctor's evaluation did not relate to the relevant time period when it reflected "the worsening of a condition or the onset of a new condition after the date of the ALJ's decision").   Therefore, the Appeals Council did not err in its consideration of the new evidence from Dr. Nichols.

### C.   The Appeals Council Properly Found Dr. Herrera's August 3, 2020, Physical Capacity Form Did Not Chronologically Relate to the Time Period of the ALJ's Decision

On August 3, 2020, Dr. Pascual Herrera, who treated Thornton at Quality of Life, completed a Physical Capacities Form.   He indicated Thornton could sit for three hours at a time and stand for one hour at a time.   He would need to lie down, sleep, or prop his feet up two hours during an eight-hour day.   He would be off-task 20% of an eight-hour workday, and he would miss ten days of work during a 30-day period due to his physical symptoms.   His limitations existed back to June 6, 2018, and they would last 12 or more months.   Thornton could occasionally lift up to 25 pounds, but he could never lift more than 25 pounds.   The conditions causing Thornton's limitations included severe traumatic arthritis, degenerative joint disease, and poorly treated sleep

apnea.   (Tr. 8).

Though Dr. Herrera checked a box indicating Thornton's limitations dated back to June 6, 2018, the Eleventh Circuit has persuasively found in multiple unpublished decisions that such an action does not necessarily indicate a medical provider based his assessment on evidence from the relevant period.   *See Griffin v. Soc. Sec. Admin., Comm'r*, 842 F. App'x 339, 342 (11th Cir. 2021) ("Dr. Feist's mental health statement did not cite to any medical evidence to support his conclusions that the limitations existed beginning in July 2012.   He merely indicated the limitations via the questionnaire and did not provide any reference to Griffin's medical records from the relevant time period to support his conclusion that the limitations did apply during the relevant time period."); *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 693 (11th Cir. 2020) (citing *Hargress*, 883 F.3d at 1310) ("In the 2017 assessment, Dr. Alterman checked a box indicating that McCullars's limitations dated back to her alleged onset date of November 11, 2011, but the records do not indicate that Dr. Alterman reviewed McCullars's medical history during the relevant time period.   Therefore, the Appeals Council properly determined that these records were not chronologically relevant."); *Lindsey v. Comm'r of Soc. Sec.*, 741 F. App'x 705, 712 (11th Cir. 2018) (citing *Hargress*, 883 F.3d at 1310; *Washington*, 806 F.3d at 1319, 1322) ("[I]t is not clear that Dr. Pappas's opinion is chronologically relevant because he never indicated that he reviewed or relied on Lindsey's prior medical records in forming his opinion, other than stating Lindsey's

28

conditions had lasted 10 to 12 years.").   Even if the assessor treated the claimant during the time period before the ALJ's decision, the assessment does not relate to the relevant time period if the assessor does not cite to evidence from that time period.   *See Howze*, 2022 WL 152236, at *3 (identity of assessor as treating physician did not render the assessment chronologically relevant when the assessor did not indicate she evaluated the claimant's past medical records when forming her opinion).

Because Dr. Herrera did not review or discuss any of Thornton's medical records from the relevant time period when he rendered the August 3, 2020, assessment, that assessment does not chronologically relate to the time period prior to the ALJ's decision.   Thus, the Appeals Council did not err in its consideration of the new evidence from Dr. Herrera.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 23rd day of March, 2022.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE